MARKMAN ET AL. *v.* WESTVIEW INSTRUMENTS, INC., ET AL.

No. 95–26.   Argued January 8, 1996—Decided April 23, 1996

SOUTER, J., delivered the opinion for a unanimous Court.

*William B. Mallin* argued the cause for petitioners. With him on the briefs were *Timothy P. Ryan, Timothy S. Coon, Lewis F. Gould, Jr.,* and *Stephan P. Gribok.*

*Frank H. Griffin III* argued the cause for respondents. With him on the brief were *Peter A. Vogt* and *Polly M. Shaffer.** .

JUSTICE SOUTER delivered the opinion of the Court.

The question here is whether the interpretation of a so-called patent claim, the portion of the patent document that defines the scope of the patentee's rights, is a matter of law reserved entirely for the court, or subject to a Seventh Amendment guarantee that a jury will determine the meaning of any disputed term of art about which expert testimony is offered. We hold that the construction of a patent, including terms of art within its claim, is exclusively within the province of the court.

---

*\*Jeffrey Robert White, Pamela A. Liapakis,* and *Joseph W. Cotchett* filed a brief for the Association of Trial Lawyers of America as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Intellectual Property Law Association by *Don W. Martens, Charles L. Gholz, R. Carl Moy, Roger W. Parkhurst, Joseph R. Re, Paul A. Stewart,* and *Harold C. Wegner;* for the Federal Circuit Bar Association by *David H. T. Kane* and *Rudolph P. Hofmann;* for the Dallas-Fort Worth Intellectual Property Law Association; for Honeywell, Inc., by *Richard G. Taranto* and *David L. Shapiro;* for Intellectual Property Owners by *Rex E. Lee, Carter G. Phillips, Mark E. Haddad,* and *Constantine L. Trela;* for Matsushita Electric Corp. of America et al. by *Morton Amster* and *Joel E. Lutzker;* for United States Surgical Corp. by *John G. Kester, J. Alan Galbraith, William E. McDaniels, Arthur R. Miller, Thomas R. Bremer,* and *John C. Andres;* for *John T. Roberts, pro se;* and for Douglas W. Wyatt by *Mr. Wyatt, pro se, Paul M. Janicke,* and *John R. Kirk, Jr.*

Briefs of *amici curiae* were filed for Airtouch Communications, Inc., by *Allan N. Littman* and *Robert P. Taylor;* for the American Automobile Manufacturers Association by *Charles W. Bradley, Stanley L. Amberg, Phillip D. Brady,* and *Andrew D. Koblenz;* for the American Board of Trial Advocates by *Robert G. Vial;* for Exxon Corp. et al. by *Donald B. Craven, Gerald Goldman, James P. Tuite,* and *James R. Lovelace;* and for Litton Systems, Inc., by *Laurence H. Tribe, Jonathan S. Massey,* and *Kenneth J. Chesebro.*

I

The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Art. I, § 8, cl. 8. Congress first exercised this authority in 1790, when it provided for the issuance of "letters patent," Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, which, like their modern counterparts, granted inventors "the right to exclude others from making, using, offering for sale, selling, or importing the patented invention," in exchange for full disclosure of an invention, H. Schwartz, Patent Law and Practice 1, 33 (2d ed. 1995). It has long been understood that a patent must describe the exact scope of an invention and its manufacture to "secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." *McClain* v. *Ortmayer*, 141 U. S. 419, 424 (1891). Under the modern American system, these objectives are served by two distinct elements of a patent document. First, it contains a specification describing the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U. S. C. § 112; see also 3 E. Lipscomb, Walker on Patents § 10:1, pp. 183–184 (3d ed. 1985) (Lipscomb) (listing the requirements for a specification). Second, a patent includes one or more "claims," which "particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention." 35 U. S. C. § 112. "A claim covers and secures a process, a machine, a manufacture, a composition of matter, or a design, but never the function or result of either, nor the scientific explanation of their operation." 6 Lipscomb § 21:17, at 315–316. The claim "define[s] the scope of a patent grant," 3 *id.*, § 11:1, at 280, and functions to forbid not only exact copies of an invention, but products that go to "the heart of an invention but avoids the literal language of the claim by making a

noncritical change," Schwartz, *supra*, at 82.[1]   In this opinion, the word "claim" is used only in this sense peculiar to patent law.

Characteristically, patent lawsuits charge what is known as infringement, Schwartz, *supra*, at 75, and rest on allegations that the defendant "without authority ma[de], use[d] or [sold the] patented invention, within the United States during the term of the patent therefor . . . ."   35 U. S. C. § 271(a). Victory in an infringement suit requires a finding that the patent claim "covers the alleged infringer's product or process," which in turn necessitates a determination of "what the words in the claim mean."   Schwartz, *supra*, at 80; see also 3 Lipscomb § 11:2, at 288–290.

Petitioner in this infringement suit, Markman, owns United States Reissue Patent No. 33,054 for his "Inventory Control and Reporting System for Drycleaning Stores." The patent describes a system that can monitor and report the status, location, and movement of clothing in a drycleaning establishment.   The Markman system consists of a keyboard and data processor to generate written records for each transaction, including a bar code readable by optical detectors operated by employees, who log the progress of clothing through the dry-cleaning process.   Respondent Westview's product also includes a keyboard and processor, and it lists charges for the dry-cleaning services on bar-coded tickets that can be read by portable optical detectors.

Markman brought an infringement suit against Westview and Althon Enterprises, an operator of dry-cleaning estab-

---

[1] Thus, for example, a claim for a ceiling fan with three blades attached to a solid rod connected to a motor would not only cover fans that take precisely this form, but would also cover a similar fan that includes some additional feature, *e. g.*, such a fan with a cord or switch for turning it on and off, and may cover a product deviating from the core design in some noncritical way, *e. g.*, a three-bladed ceiling fan with blades attached to a hollow rod connected to a motor.   H. Schwartz, Patent Law and Practice 81–82 (2d ed. 1995).

lishments using Westview's products (collectively, West-view). Westview responded that Markman's patent is not infringed by its system because the latter functions merely to record an inventory of receivables by tracking invoices and transaction totals, rather than to record and track an inventory of articles of clothing. Part of the dispute hinged upon the meaning of the word "inventory," a term found in Markman's independent claim 1, which states that Markman's product can "maintain an inventory total" and "detect and localize spurious additions to inventory." The case was tried before a jury, which heard, among others, a witness produced by Markman who testified about the meaning of the claim language.

After the jury compared the patent to Westview's device, it found an infringement of Markman's independent claim 1 and dependent claim 10.[2] The District Court nevertheless granted Westview's deferred motion for judgment as a matter of law, one of its reasons being that the term "inventory" in Markman's patent encompasses "both cash inventory and the actual physical inventory of articles of clothing." 772 F. Supp. 1535, 1537–1538 (ED Pa. 1991). Under the trial court's construction of the patent, the production, sale, or use of a tracking system for dry cleaners would not infringe Markman's patent unless the product was capable of tracking articles of clothing throughout the cleaning process and generating reports about their status and location. Since Westview's system cannot do these things, the District Court directed a verdict on the ground that Westview's device does not have the "means to maintain an inventory total" and thus cannot "'detect and localize spurious additions to inventory as well as spurious deletions therefrom,'" as required by claim 1. *Id.*, at 1537.

---

[2] Dependent claim 10 specifies that, in the invention of claim 1, the input device is an alpha-numeric keyboard in which single keys may be used to enter the attributes of the items in question.

Markman appealed, arguing it was error for the District Court to substitute its construction of the disputed claim term 'inventory' for the construction the jury had presumably given it. The United States Court of Appeals for the Federal Circuit affirmed, holding the interpretation of claim terms to be the exclusive province of the court and the Seventh Amendment to be consistent with that conclusion. 52 F. 3d 967 (1995). Markman sought our review on each point, and we granted certiorari. 515 U. S. 1192 (1995). We now affirm.

## II

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." U. S. Const., Amdt. 7. Since Justice Story's day, *United States* v. *Wonson*, 28 F. Cas. 745, 750 (No. 16,750) (CC Mass. 1812), we have understood that "[t]he right of trial by jury thus preserved is the right which existed under the English common law when the Amendment was adopted." *Baltimore & Carolina Line, Inc.* v. *Redman*, 295 U. S. 654, 657 (1935). In keeping with our longstanding adherence to this "historical test," Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn. L. Rev. 639, 640–643 (1973), we ask, first, whether we are dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was, see, *e. g., Tull* v. *United States*, 481 U. S. 412, 417 (1987). If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791. See *infra*, at 377–378.[3]

---

[3] Our formulations of the historical test do not deal with the possibility of conflict between actual English common-law practice and American assumptions about what that practice was, or between English and American practices at the relevant time. No such complications arise in this case.

## A

As to the first issue, going to the character of the cause of action, "[t]he form of our analysis is familiar. 'First we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity.'" *Granfinanciera, S. A.* v. *Nordberg,* 492 U. S. 33, 42 (1989) (citation omitted). Equally familiar is the descent of today's patent infringement action from the infringement actions tried at law in the 18th century, and there is no dispute that infringement cases today must be tried to a jury, as their predecessors were more than two centuries ago. See, *e. g., Bramah* v. *Hardcastle,* 1 Carp. P. C. 168 (K. B. 1789).

## B

This conclusion raises the second question, whether a particular issue occurring within a jury trial (here the construction of a patent claim) is itself necessarily a jury issue, the guarantee being essential to preserve the right to a jury's resolution of the ultimate dispute. In some instances the answer to this second question may be easy because of clear historical evidence that the very subsidiary question was so regarded under the English practice of leaving the issue for a jury. But when, as here, the old practice provides no clear answer, see *infra,* at 378–380, we are forced to make a judgment about the scope of the Seventh Amendment guarantee without the benefit of any foolproof test.

The Court has repeatedly said that the answer to the second question "must depend on whether the jury must shoulder this responsibility *as necessary to preserve the 'substance of the common-law right of trial by jury.'*" *Tull* v. *United States, supra,* at 426 (emphasis added) (quoting *Colgrove* v. *Battin,* 413 U. S. 149, 157 (1973)); see also *Baltimore & Carolina Line, supra,* at 657. "'"Only those incidents which are regarded as fundamental, as inherent in and of the essence of the system of trial by jury, are placed be-

yond the reach of the legislature." ' " *Tull* v. *United States,
supra,* at 426 (citations omitted); see also *Galloway* v. *United
States,* 319 U. S. 372, 392 (1943).

The "substance of the common-law right" is, however, a
pretty blunt instrument for drawing distinctions. We have
tried to sharpen it, to be sure, by reference to the distinction
between substance and procedure. See *Baltimore & Carolina
Line, supra,* at 657; see also *Galloway* v. *United States,
supra,* at 390–391; *Ex parte Peterson,* 253 U. S. 300, 309
(1920); *Walker* v. *New Mexico & Southern Pacific R. Co.,* 165
U. S. 593, 596 (1897); but see *Sun Oil Co.* v. *Wortman,* 486
U. S. 717, 727 (1988). We have also spoken of the line as one
between issues of fact and law. See *Baltimore & Carolina
Line, supra,* at 657; see also *Ex parte Peterson, supra,* at
310; *Walker* v. *New Mexico & Southern Pacific R. Co., supra,*
at 597; but see *Pullman-Standard* v. *Swint,* 456 U. S. 273,
288 (1982).

But the sounder course, when available, is to classify a
mongrel practice (like construing a term of art following re-
ceipt of evidence) by using the historical method, much as
we do in characterizing the suits and actions within which
they arise. Where there is no exact antecedent, the best
hope lies in comparing the modern practice to earlier ones
whose allocation to court or jury we do know, cf. *Balti-
more & Carolina Line, supra,* at 659, 660; *Dimick* v. *Schiedt,*
293 U. S. 474, 477, 482 (1935), seeking the best analogy we
can draw between an old and the new, see *Tull* v. *United
States, supra,* at 420–421 (we must search the English com-
mon law for "appropriate analogies" rather than a "precisely
analogous common-law cause of action").

## C

"Prior to 1790 nothing in the nature of a claim had ap-
peared either in British patent practice or in that of the

American states," Lutz, Evolution of the Claims of U. S. Patents, 20 J. Pat. Off. Soc. 134 (1938), and we have accordingly found no direct antecedent of modern claim construction in the historical sources. Claim practice did not achieve statutory recognition until the passage of the Act of July 4, 1836, ch. 357, § 6, 5 Stat. 119, and inclusion of a claim did not become a statutory requirement until 1870, Act of July 8, 1870, ch. 230, § 26, 16 Stat. 201; see 1 A. Deller, Patent Claims § 4, p. 9 (2d ed. 1971). Although, as one historian has observed, as early as 1850 "judges were . . . beginning to express more frequently the idea that in seeking to ascertain the invention 'claimed' in a patent the inquiry should be limited to interpreting the summary, or 'claim,'" Lutz, *supra*, at 145, "[t]he idea that the claim is just as important if not more important than the description and drawings did not develop until the Act of 1870 or thereabouts." Deller, *supra*, § 4, at 9.

At the time relevant for Seventh Amendment analogies, in contrast, it was the specification, itself a relatively new development, H. Dutton, The Patent System and Inventive Activity During the Industrial Revolution, 1750–1852, pp. 75–76 (1984), that represented the key to the patent. Thus, patent litigation in that early period was typified by so-called novelty actions, testing whether "any essential part of [the patent had been] disclosed to the public before," *Huddart* v. *Grimshaw*, Dav. Pat. Cas. 265, 298 (K. B. 1803), and "enablement" cases, in which juries were asked to determine whether the specification described the invention well enough to allow members of the appropriate trade to reproduce it, see, *e. g.*, *Arkwright* v. *Nightingale*, Dav. Pat. Cas. 37, 60 (C. P. 1785).

The closest 18th-century analogue of modern claim construction seems, then, to have been the construction of specifications, and as to that function the mere smattering

of patent cases that we have from this period[4] shows no established jury practice sufficient to support an argument by analogy that today's construction of a claim should be a guaranteed jury issue.  Few of the case reports even touch upon the proper interpretation of disputed terms in the specifications at issue, see, *e. g., Bramah* v. *Hardcastle*, 1 Carp. P. C. 168 (K. B. 1789); *King* v. *Else*, 1 Carp. P. C. 103, Dav. Pat. Cas. 144 (K. B. 1785); *Dollond's Case*, 1 Carp. P. C. 28 (C. P. 1758); *Administrators of Calthorp* v. *Waymans*, 3 Keb. 710, 84 Eng. Rep. 966 (K. B. 1676), and none demonstrates that the definition of such a term was determined by the jury.[5]  This absence of an established practice should not surprise us, given the primitive state of jury patent practice at the end of the 18th century, when juries were still new to the field.  Although by 1791 more than a century had passed since the enactment of the Statute of Monopolies, which pro-

---

[4] Before the turn of the century, "no more than twenty-two [reported] cases came before the superior courts of London."  H. Dutton, The Patent System and Inventive Activity During the Industrial Revolution, 1750–1852, p. 71 (1984).

[5] Markman relies heavily upon Justice Buller's notes of Lord Mansfield's instructions in *Liardet* v. *Johnson* (K. B. 1778), in 1 J. Oldham, The Mansfield Manuscripts and the Growth of English Law in the Eighteenth Century 748 (1992).  *Liardet* was an enablement case about the invention of stucco, in which a defendant asserted that the patent was invalid because it did not fully describe the appropriate method for producing the substance.  Even setting aside concerns about the accuracy of the summary of the jury instructions provided for this case from outside the established reports, see 1 Oldham, *supra*, at 752, n. 11, it does not show that juries construed disputed terms in a patent.  From its ambiguous references, *e. g.*, 1 Oldham, *supra*, at 756 ("[Lord Mansfield] left to the jury 1st, on all objections made to exactness, certainty and propriety of the Specification, & whether any workman could make it by [the Specification]"), we cannot infer the existence of an established practice, cf. *Galloway* v. *United States*, 319 U. S. 372, 392 (1943) (expressing concern regarding the "uncertainty and the variety of conclusions which follows from an effort at purely historical accuracy"), especially when, as here, the inference is undermined by evidence that judges, rather than jurors, ordinarily construed written documents at the time.  See *infra*, at 381–383.

vided that the validity of any monopoly should be determined in accordance with the common law, patent litigation had remained within the jurisdiction of the Privy Council until 1752 and hence without the option of a jury trial. E. Walterscheid, Early Evolution of the United States Patent Law: Antecedents (Part 3), 77 J. Pat. & Tm. Off. Soc. 771, 771–776 (1995). Indeed, the state of patent law in the common-law courts before 1800 led one historian to observe that "the reported cases are destitute of any decision of importance .... At the end of the eighteenth century, therefore, the Common Law Judges were left to pick up the threads of the principles of law without the aid of recent and reliable precedents." Hulme, On the Consideration of the Patent Grant, Past and Present, 13 L. Q. Rev. 313, 318 (1897). Earlier writers expressed similar discouragement at patent law's amorphous character,[6] and, as late as the 1830's, English commentators were irked by enduring confusion in the field. See Dutton, *supra*, at 69–70.

Markman seeks to supply what the early case reports lack in so many words by relying on decisions like *Turner* v. *Winter*, 1 T. R. 602, 99 Eng. Rep. 1274 (K. B. 1787), and *Arkwright* v. *Nightingale*, Dav. Pat. Cas. 37 (C. P. 1785), to argue that the 18th-century juries must have acted as definers of patent terms just to reach the verdicts we know they rendered in patent cases turning on enablement or novelty. But the conclusion simply does not follow. There is no more reason to infer that juries supplied plenary interpretation of written instruments in patent litigation than in other cases implicating the meaning of documentary terms, and we do know that in other kinds of cases during this period judges,

---

[6] See, *e. g.*, *Boulton and Watt* v. *Bull*, 2 H. Bl. 463, 491, 126 Eng. Rep. 651, 665 (C. P. 1795) (Eyre, C. J.) ("Patent rights are no where that I can find accurately discussed in our books"); Dutton, *supra* n. 4, at 70–71 (quoting Abraham Weston as saying "it may with truth be said that the [Law] Books are silent on the subject [of patents] and furnish no clue to go by, in agitating the Question What is the Law of Patents?").

not juries, ordinarily construed written documents.[7] The probability that the judges were doing the same thing in the patent litigation of the time is confirmed by the fact that as soon as the English reports did begin to describe the construction of patent documents, they show the judges construing the terms of the specifications. See *Bovill* v. *Moore*, Dav. Pat. Cas. 361, 399, 404 (C. P. 1816) (judge submits question of novelty to the jury only after explaining some of the language and "stat[ing] in what terms the specification runs"); cf. *Russell* v. *Cowley & Dixon*, Webs. Pat. Cas. 457, 467–470 (Exch. 1834) (construing the terms of the specification in reviewing a verdict); *Haworth* v. *Hardcastle*, Webs. Pat. Cas. 480, 484–485 (1834) (same). This evidence is in fact buttressed by cases from this Court; when they first reveal actual practice, the practice revealed is of the judge construing the patent. See, *e. g.*, *Winans* v. *New York & Erie R. Co.*, 21 How. 88, 100 (1859); *Winans* v. *Denmead*, 15 How. 330, 338 (1854); *Hogg* v. *Emerson*, 6 How. 437, 484 (1848); cf. *Parker* v. *Hulme*, 18 F. Cas. 1138 (No. 10,740) (CC ED Pa. 1849). These indications of our patent practice are the more impressive for being all of a piece with what we know about the analogous contemporary practice of inter-

---

[7] See, *e. g.*, Devlin, Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment, 80 Colum. L. Rev. 43, 75 (1980); Weiner, The Civil Jury Trial and the Law-Fact Distinction, 54 Calif. L. Rev. 1867, 1932 (1966). For example, one historian observed that it was generally the practice of judges in the late 18th century "to keep the construction of writings *out of the jury's hands* and reserve it for themselves," a "safeguard" designed to prevent a jury from "constru[ing] or refin[ing] it at pleasure." 9 J. Wigmore, Evidence § 2461, p. 194 (J. Chadbourn rev. ed. 1981) (emphasis in original; internal quotation marks omitted). The absence of any established practice supporting Markman's view is also shown by the disagreement between Justices Willis and Buller, reported in *Macbeath* v. *Haldimand*, 1 T. R. 173, 180–182, 99 Eng. Rep. 1036, 1040–1041 (K. B. 1786), as to whether juries could ever construe written documents when their meaning was disputed.

preting terms within a land patent, where it fell to the judge, not the jury, to construe the words.[8]

## D

Losing, then, on the contention that juries generally had interpretive responsibilities during the 18th century, Markman seeks a different anchor for analogy in the more modest contention that even if judges were charged with construing most terms in the patent, the art of defining terms of art employed in a specification fell within the province of the jury. Again, however, Markman has no authority from the period in question, but relies instead on the later case of *Neilson* v. *Harford*, Webs. Pat. Cas. 328 (Exch. 1841). There, an exchange between the judge and the lawyers indicated that although the construction of a patent was ordinarily for the court, *id.*, at 349 (Alderson, B.), judges should "leav[e] the question of words of art to the jury," *id.*, at 350 (Alderson, B.); see also *id.*, at 370 (judgment of the court); *Hill* v. *Evans*, 4 De. G. F. & J. 288, 293–294, 45 Eng. Rep. 1195, 1197 (Ch. 1862). Without, however, in any way disparaging the weight to which Baron Alderson's view is entitled, the most we can say is that an English report more than 70 years after the time that concerns us indicates an exception to what probably had been occurring earlier.[9] In place of

---

[8] As we noted in *Brown* v. *Huger*, 21 How. 305, 318 (1859):

"With regard to the second part of this objection, that which claims for the jury the construction of the patent, we remark that the patent itself must be taken as evidence of its meaning; that, like other written instruments, it must be interpreted as a whole . . . and the legal deductions drawn therefrom must be conformable with the scope and purpose of the entire document. This construction and these deductions we hold to be within the exclusive province of the court."

[9] In explaining that judges generally construed all terms in a written document at the end of the 18th century, one historian observed that "[i]nterpretation by local usage for example (today the plainest case of legitimate deviation from the normal standard) was still but making its way." 9 Wigmore, Evidence § 2461, at 195; see also *id.*, at 195, and n. 6 (providing examples of this practice). We need not in any event consider here

Markman's inference that this exceptional practice existed in 1791 there is at best only a possibility that it did, and for anything more than a possibility we have found no scholarly authority.

## III

Since evidence of common-law practice at the time of the framing does not entail application of the Seventh Amendment's jury guarantee to the construction of the claim document, we must look elsewhere to characterize this determination of meaning in order to allocate it as between court or jury. We accordingly consult existing precedent[10] and consider both the relative interpretive skills of judges and juries and the statutory policies that ought to be furthered by the allocation.

## A

The two elements of a simple patent case, construing the patent and determining whether infringement occurred, were characterized by the former patent practitioner, Justice Curtis.[11] "The first is a question of law, to be determined by the court, construing the letters-patent, and the description of the invention and specification of claim annexed to them. The second is a question of fact, to be submitted to a jury." *Winans* v. *Denmead, supra,* at 338; see *Winans* v.

---

whether our conclusion that the Seventh Amendment does not require terms of art in patent claims to be submitted to the jury supports a similar result in other types of cases.

[10] Because we conclude that our precedent supports classifying the question as one for the court, we need not decide either the extent to which the Seventh Amendment can be said to have crystallized a law/fact distinction, cf. *Ex parte Peterson,* 253 U. S. 300, 310 (1920); *Walker* v. *New Mexico & Southern Pacific R. Co.,* 165 U. S. 593, 597 (1897), or whether post-1791 precedent classifying an issue as one of fact would trigger the protections of the Seventh Amendment if (unlike this case) there were no more specific reason for decision.

[11] See 1 A Memoir of Benjamin Robbins Curtis, L. L. D., 84 (B. Curtis ed. 1879); cf. *O'Reilly* v. *Morse,* 15 How. 62, 63 (1854) (noting his involvement in a patent case).

*New York & Erie R. Co., supra,* at 100; *Hogg* v. *Emerson, supra,* at 484; cf. *Parker* v. *Hulme, supra,* at 1140.

In arguing for a different allocation of responsibility for the first question, Markman relies primarily on two cases, *Bischoff* v. *Wethered,* 9 Wall. 812 (1870), and *Tucker* v. *Spalding,* 13 Wall. 453 (1872). These are said to show that evidence of the meaning of patent terms was offered to 19th-century juries, and thus to imply that the meaning of a documentary term was a jury issue whenever it was subject to evidentiary proof. That is not what Markman's cases show, however.

In order to resolve the *Bischoff* suit implicating the construction of rival patents, we considered "whether the court below was bound to compare the two specifications, and to instruct the jury, as a matter of law, whether the inventions therein described were, or were not, identical." 9 Wall., at 813 (statement of the case). We said it was not bound to do that, on the ground that investing the court with so dispositive a role would improperly eliminate the jury's function in answering the ultimate question of infringement. On that ultimate issue, expert testimony had been admitted on "the nature of the various mechanisms or manufactures described in the different patents produced, and as to the identity or diversity between them." *Id.,* at 814. Although the jury's consideration of that expert testimony in resolving the question of infringement was said to impinge upon the well-established principle "that it is the province of the court, and not the jury, to construe the meaning of documentary evidence," *id.,* at 815, we decided that it was not so. We said:

> "[T]he specifications . . . profess to describe mechanisms and complicated machinery, chemical compositions and other manufactured products, which have their existence *in pais,* outside of the documents themselves; and which are commonly described by terms of the art or mystery to which they respectively belong; and these

descriptions and terms of art often require peculiar knowledge and education to understand them aright.... Indeed, the whole subject-matter of a patent is an embodied conception outside of the patent itself.... This outward embodiment of the terms contained in the patent is the thing invented, and is to be properly sought, like the explanation of all latent ambiguities arising from the description of external things, by evidence *in pais.*" *Ibid.*

*Bischoff* does not then, as Markman contends, hold that the use of expert testimony about the meaning of terms of art requires the judge to submit the question of their construction to the jury. It is instead a case in which the Court drew a line between issues of document interpretation and product identification, and held that expert testimony was properly presented to the jury on the latter, ultimate issue, whether the physical objects produced by the patent were identical. The Court did not see the decision as bearing upon the appropriate treatment of disputed terms. As the opinion emphasized, the Court's "view of the case is not intended to, and does not, trench upon the doctrine that the construction of written instruments is the province of the court alone. *It is not the construction of the instrument, but the character of the thing invented, which is sought in questions of identity and diversity of inventions.*" *Id.*, at 816 (emphasis added). *Tucker*, the second case proffered by Markman, is to the same effect. Its reasoning rested expressly on *Bischoff*, and it just as clearly noted that in addressing the ultimate issue of mixed fact and law, it was for the court to "lay down to the jury the law which should govern them." *Tucker, supra*, at 455.[12]

---

[12] We are also unpersuaded by petitioner's heavy reliance upon the decision of Justice Story on circuit in *Washburn* v. *Gould*, 29 F. Cas. 312 (No. 17,214) (CC Mass. 1844). Although he wrote that "[t]he jury are to judge of the meaning of words of art, and technical phrases," *id.*, at 325, he did so in describing the decision in *Neilson* v. *Harford*, Webs. Pat. Cas. 328

If the line drawn in these two opinions is a fine one, it is one that the Court has drawn repeatedly in explaining the respective roles of the jury and judge in patent cases,[13] and one understood by commentators writing in the aftermath of the cases Markman cites. Walker, for example, read *Bischoff* as holding that the question of novelty is not decided by a construction of the prior patent, "but depends rather upon the outward embodiment of the terms contained in the [prior patent]; and that such outward embodiment is to be properly sought, like the explanation of latent ambiguities arising from the description of external things, by evidence *in pais.*" A. Walker, Patent Laws § 75, p. 68 (3d ed. 1895). He also emphasized in the same treatise that matters of claim construction, even those aided by expert testimony, are questions for the court:

> "Questions of construction are questions of law for the judge, not questions of fact for the jury. As it cannot be expected, however, that judges will always possess the requisite knowledge of the meaning of the terms of art or science used in letters patent, it often becomes necessary that they should avail themselves of the light furnished by experts relevant to the significance of such words and phrases. The judges are not, however, obliged to blindly follow such testimony." *Id.*, § 189, at 173 (footnotes omitted).

Virtually the same description of the court's use of evidence in its interpretive role was set out in another contemporary treatise:

---

(Exch. 1841), which we discuss, *supra*, at 383, and, whether or not he agreed with *Neilson*, he stated, "[b]ut I do not proceed upon this ground." 29 F. Cas., at 325.

[13] See, *e. g., Coupe* v. *Royer*, 155 U. S. 565, 579–580 (1895); *Silsby* v. *Foote*, 14 How. 218, 226 (1853); *Hogg* v. *Emerson*, 6 How. 437, 484 (1848); cf. *Brown* v. *Piper*, 91 U. S. 37, 41 (1875); *Winans* v. *New York & Erie R. Co.*, 21 How. 88, 100 (1859); cf. also *U. S. Industrial Chemicals, Inc.* v. *Carbide & Carbon Chemicals Corp.*, 315 U. S. 668, 678 (1942).

"The duty of interpreting letters-patent has been com-
mitted to the courts. A patent is a legal instrument, to
be construed, like other legal instruments, according to
its tenor. . . . Where technical terms are used, or where
the qualities of substances or operations mentioned or
any similar data necessary to the comprehension of the
language of the patent are unknown to the judge, the
testimony of witnesses may be received upon these sub-
jects, and any other means of information be employed.
*But in the actual interpretation of the patent the court
proceeds upon its own responsibility, as an arbiter of
the law, giving to the patent its true and final charac-
ter and force.*"    2 W. Robinson, Law of Patents § 732,
pp. 481–483 (1890) (emphasis added; footnotes omitted).

In sum, neither *Bischoff* nor *Tucker* indicates that juries re-
solved the meaning of terms of art in construing a patent,
and neither case undercuts Justice Curtis's authority.

## B

Where history and precedent provide no clear answers,
functional considerations also play their part in the choice
between judge and jury to define terms of art. We said in
*Miller* v. *Fenton*, 474 U. S. 104, 114 (1985), that when an issue
"falls somewhere between a pristine legal standard and a
simple historical fact, the fact/law distinction at times has
turned on a determination that, as a matter of the sound
administration of justice, one judicial actor is better posi-
tioned than another to decide the issue in question." So it
turns out here, for judges, not juries, are the better suited
to find the acquired meaning of patent terms.

The construction of written instruments is one of those
things that judges often do and are likely to do better than
jurors unburdened by training in exegesis. Patent con-
struction in particular "is a special occupation, requiring, like
all others, special training and practice. The judge, from
his training and discipline, is more likely to give a proper

interpretation to such instruments than a jury; and he is, therefore, more likely to be right, in performing such a duty, than a jury can be expected to be." *Parker* v. *Hulme*, 18 F. Cas., at 1140. Such was the understanding nearly a century and a half ago, and there is no reason to weigh the respective strengths of judge and jury differently in relation to the modern claim; quite the contrary, for "the claims of patents have become highly technical in many respects as the result of special doctrines relating to the proper form and scope of claims that have been developed by the courts and the Patent Office." Woodward, Definiteness and Particularity in Patent Claims, 46 Mich. L. Rev. 755, 765 (1948).

Markman would trump these considerations with his argument that a jury should decide a question of meaning peculiar to a trade or profession simply because the question is a subject of testimony requiring credibility determinations, which are the jury's forte. It is, of course, true that credibility judgments have to be made about the experts who testify in patent cases, and in theory there could be a case in which a simple credibility judgment would suffice to choose between experts whose testimony was equally consistent with a patent's internal logic. But our own experience with document construction leaves us doubtful that trial courts will run into many cases like that. In the main, we expect, any credibility determinations will be subsumed within the necessarily sophisticated analysis of the whole document, required by the standard construction rule that a term can be defined only in a way that comports with the instrument as a whole. See *Bates* v. *Coe*, 98 U. S. 31, 38 (1878); 6 Lipscomb § 21:40, at 393; 2 Robinson, *supra*, § 734, at 484; Woodward, *supra*, at 765; cf. *U. S. Industrial Chemicals, Inc.* v. *Carbide & Carbon Chemicals Co.*, 315 U. S. 668, 678 (1942); cf. 6 Lipscomb § 21:40, at 393. Thus, in these cases a jury's capabilities to evaluate demeanor, cf. *Miller*, *supra*, at 114, 117, to sense the "mainsprings of human conduct," *Commissioner* v. *Duberstein*, 363 U. S. 278, 289 (1960), or to reflect community

standards, *United States* v. *McConney,* 728 F. 2d 1195, 1204 (CA9 1984) (en banc), are much less significant than a trained ability to evaluate the testimony in relation to the overall structure of the patent. The decisionmaker vested with the task of construing the patent is in the better position to ascertain whether an expert's proposed definition fully comports with the specification and claims and so will preserve the patent's internal coherence. We accordingly think there is sufficient reason to treat construction of terms of art like many other responsibilities that we cede to a judge in the normal course of trial, notwithstanding its evidentiary underpinnings.

## C

Finally, we see the importance of uniformity in the treatment of a given patent as an independent reason to allocate all issues of construction to the court. As we noted in *General Elec. Co.* v. *Wabash Appliance Corp.,* 304 U. S. 364, 369 (1938), "[t]he limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others and the assurance that the subject of the patent will be dedicated ultimately to the public." Otherwise, a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field," *United Carbon Co.* v. *Binney & Smith Co.,* 317 U. S. 228, 236 (1942), and "[t]he public [would] be deprived of rights supposed to belong to it, without being clearly told what it is that limits these rights." *Merrill* v. *Yeomans,* 94 U. S. 568, 573 (1877). It was just for the sake of such desirable uniformity that Congress created the Court of Appeals for the Federal Circuit as an exclusive appellate court for patent cases, H. R. Rep. No. 97–312, pp. 20–23 (1981), observing that increased uniformity would "strengthen the United States patent system in such a way as to foster technological growth and industrial innovation." *Id.,* at 20.

Uniformity would, however, be ill served by submitting issues of document construction to juries. Making them jury issues would not, to be sure, necessarily leave evidentiary questions of meaning wide open in every new court in which a patent might be litigated, for principles of issue preclusion would ordinarily foster uniformity. Cf. *Blonder-Tongue Laboratories, Inc.* v. *University of Ill. Foundation*, 402 U. S. 313 (1971). But whereas issue preclusion could not be asserted against new and independent infringement defendants even within a given jurisdiction, treating interpretive issues as purely legal will promote (though it will not guarantee) intrajurisdictional certainty through the application of *stare decisis* on those questions not yet subject to interjurisdictional uniformity under the authority of the single appeals court.

\*        \*        \*

Accordingly, we hold that the interpretation of the word "inventory" in this case is an issue for the judge, not the jury, and affirm the decision of the Court of Appeals for the Federal Circuit.

*It is so ordered.*