The **TORO COMPANY, a Delaware
corporation, Plaintiff,**

v.

**TEXTRON, INC., a Delaware corpora-
tion, and Jacobsen, a Textron Compa-
ny, a division of Textron, Inc., Defen-
dants.**

No. 05–CV–1835 (PJS/JJG).

United States District Court,
D. Minnesota.

June 4, 2007.

Anthony R. Zeuli, Earl D. Reiland, Keith M. Sorge, and Thomas R. Johnson, Merchant & Gould PC, Minneapolis, MN, for Plaintiff.

Christopher C. Campbell, David M. Young, Scott L. Robertson, and Jennifer A. Albert, Goodwin Procter, Washington, DC, Thomas S. Fraser and Kurt J. Nied-erluecke, Fredrikson & Byron, PA, Minneapolis, MN, for Defendants.

## MARKMAN ORDER

SCHILTZ, District Judge.

This matter is before the Court for construction of certain terms found in the claims of U.S. Patent No. 5,533,325 (the '325 patent) and U.S. Patent No. 5,715,664 (the '664 patent) in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390–91, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The parties prepared a joint claim-construction statement [Docket No. 45], and each side submitted two briefs (opening and response) on claim-construction issues [Docket Nos. 56, 59, 63, and 66]. The Court held a *Markman* hearing on January 29, 2007.

## I. BACKGROUND

Plaintiff The Toro Company ("Toro") makes groundskeeping equipment, including riding mowers and similar vehicles. Toro owns the '325 patent and the '664 patent, both of which are directed to a particular type of hydraulic drive system for vehicles. The two patents resulted from the same initial application. In the course of examining the initial application, the U.S. Patent and Trademark Office ("PTO") determined that the application described two separate inventions, one directed to vehicles in general and a second directed to riding mowers only. Joint Appendix ("JA") 0058. The PTO therefore required the applicant to split the application into two separate applications, *see* JA 0057–59, and the '325 and '664 patents ultimately issued from those two applications. The patents' written descriptions are identical, and the drawings of the patents differ only in that the '664 patent includes one additional drawing (Figure 6 of the '664 patent). The real difference between the patents is in their claims: The

claims of the '325 patent are directed to a "riding mower" or a "turf maintenance vehicle," while the claims of the '664 patent are directed more generally to a "hydraulically driven vehicle having all-wheel drive." *See, e.g.,* '325 patent claims 1 & 15; '664 patent claims claim 1.

In August 2005, Toro sued defendants Textron, Inc., and Jacobsen, a Textron division (collectively, "Textron") for infringing the '325 and '664 patents by manufacturing and selling infringing vehicles. Textron counterclaimed, seeking a declaratory judgment that Toro's patents are invalid and not infringed.[1]

## II. GENERAL LEGAL PRINCIPLES

 Courts, not juries, construe patent claims. *Markman,* 517 U.S. at 391, 116 S.Ct. 1384. Language in a particular claim must be construed in the context of both that individual claim and the entire patent, including the specification. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed.Cir.2005) (en banc). Indeed, the specification, read in light of the prosecution history, is the primary basis for construing patent claims. *Id.* at 1315. Courts may also rely on "extrinsic evidence"—anything other than the patent and its prosecution history—but that evidence is secondary to the intrinsic evidence. *Id.* at 1317.

 In general, claim language means whatever it would have meant, ordinarily and customarily, to a person of ordinary skill in the art at the time the patent application was filed. *Id.* at 1312–13. In some cases, the ordinary and customary meaning of claim language to a person of ordinary skill in the art may be identical to the meaning that the language would have to a lay person who is not skilled in the art. *Id.* at 1314.

## III. CLAIM CONSTRUCTION

The parties originally proposed in their joint claim-construction statement ("JCCS") that the Court construe 15 terms that appear in various claims in the '325 and '664 patents. As to five of the original 15 terms, the parties agreed at an in-chambers conference on August 22, 2006 either on how to construe the terms or that the terms need not be construed at all. The parties have also agreed that three of the original 15 terms (terms 6, 12, and 13 in the JCCS) can be treated as a single term, since the key language to be construed is identical in all three terms. Accordingly, the Court addresses only the eight remaining disputed terms, which were addressed in the parties' *Markman* briefs. As did the parties in their *Markman* briefs, the Court will refer to these eight disputed terms by the numbers they bore in the JCCS: numbers 1, 4, 6, 7, 8, 9, 11, and 14. The Court is grateful to the parties for cooperating in narrowing the number of terms that need to be construed.

### A. Disputed Term 1: "riding mower"

 The Court construes the term "riding mower" in Claims 1 and 9 of the '325 patent to be a claim limitation that means:

A mower on which a person can ride.

 Toro and Textron disagree over whether the term "riding mower" is a claim limitation at all. Textron argues that because the term appears in the preamble of both Claims 1 and 9—that is, it appears before the transition word "comprises" and the subsequent series of limitations—it is not a claim limitation. Textron Opening Br. at 12–15. Toro counters that the term "riding mower" is a limitation because it defines the invention

---

1. The parties are also involved in patent litigation in federal court in Delaware. *Textron Innovations, Inc. v. The Toro Co.,* No. 1:05– CV–00486 (D.Del.). That litigation is irrelevant to this *Markman* order.

and was added during prosecution in response to an election requirement imposed by the U.S. Patent and Trademark Office ("PTO"). Toro Opening Br. at 16–19.

As a general rule, preamble language that merely states an invention's purpose or intended use is not limiting. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed.Cir.2006). The general rule gives way, though, when the body of the claim does not describe a complete invention, *id.* at 952, or when the preamble language "is necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed.Cir.2002) (quotations omitted). In addition, under the Federal Circuit's opinion in *Bass Pro Trademarks, L.L.C. v. Cabela's, Inc.*, the general rule also gives way when preamble language describes an essential feature of the invention and was added during prosecution to overcome rejection by the PTO. 485 F.3d 1364 (Fed.Cir.2007).

*Bass Pro* involved a patent on a vest that incorporated a seat that could be folded down out of the vest. The original patent application claimed a "garment" with a foldable seat. The patent examiner rejected the application as unpatentable over the prior art, and the patentee responded by changing the phrase "a garment having a seat member" to "a combination vest and pivotable seat member." 485 F.3d at 1369. Although the word "vest" occurred in the preamble of the issued claims, *id.* at 1369, the Federal Circuit held that "vest" was a claim limitation in light of the prosecution history, *id.* at 369.

This case is controlled by *Bass Pro*. The term "riding mower" was added by Toro in response to the PTO's requirement that the application be split into a first application including claims directed to "a riding mower," and a second including claims directed to "an all wheel drive vehicle." JA

0058–59 (letter from PTO requiring election); JA 0065–74 (amendment by patentee of application that issued as '325 patent). This case differs from *Bass Pro* in that the claims were amended in this case in response to an election requirement, whereas in *Bass Pro* the claims were amended to overcome a rejection based on the prior art. But nothing in *Bass Pro* suggests that these two types of amendments—amendments made in response to an election requirement, and amendments made to overcome prior art—should be treated differently. Accordingly, the term "riding mower" is a limitation of Claims 1 and 9 of the '325 patent.

Having determined that the term "riding mower" is a claim limitation, the Court must next determine how to construe this limitation. Textron argues that, in light of the '325 patent's specification, "riding mower" should be construed (assuming that it must be construed at all) to mean "a vehicle that carries one or more cutting units." Textron Opening Br. at 15. Toro argues that the term need not be construed at all. Toro Opening Br. at 19. Alternatively, Toro argues that "riding mower" means "a motor driven device capable of mowing on which an operator rides." *Id.*

The Court rejects Textron's proposed construction because it is narrower than the claim language requires. The word "mower" is easily understood, and nothing in the intrinsic evidence suggests that it should be given the narrow meaning proposed by Textron. The Court agrees with Toro that the term "riding mower" should be given its ordinary meaning, and the Court's construction simply makes plain that ordinary meaning.

### B. Term 4: "source of pressurized fluid"

The Court finds that it need not construe the claim term "source of pressur-

ized fluid," which appears in claims 1, 9, 15, and 24 of the '325 patent and claims 1, 9, 11, and 14 of the '664 patent.

Textron argues that "source of pressurized fluid" means a pump/flow-control valve combination disclosed in the '325 patent's written description.[2] Textron Opening Br. at 16. In effect, Textron asks the Court to limit the claim language to a preferred embodiment—that is, to read a limitation from the specification into the claims. This the Court cannot do. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed.Cir.2001) (describing "one of the cardinal sins of patent law—reading a limitation from the written description into the claims").

Toro argues that "source of pressurized fluid" need not be construed. Toro Opening Br. at 21. The Court agrees. The phrase "source of pressurized fluid" is comprehensible to a lay person and necessarily encompasses the pump/flow-control valve system described in the '325 patent. '325 patent Col. 5:8–10. Accordingly, the Court will not construe this term.

*C. Term 6: "connected in series"*

The Court construes the term "connected in series," which appears in claims 1, 9, 15, and 24 of the '325 patent and claims 1 and 9 of the '664 patent, to mean:

Connected in a sequential arrangement. This is the construction proposed by Toro, Toro Opening Br. at 23, and it is consistent with the patent claims and written descriptions.

Textron argues that this term "means that the pressurized fluid is directed *without branching* from the wheel drive motors for the front wheels to the wheel drive motor for the rear wheel." Textron Opening Br. at 18 (emphasis added). The

Court rejects Textron's proposed construction because it improperly adds the phrase "without branching" to the claim language.

The Court disagrees with Textron that the prosecution history mandates that the term "connected in series" be construed to incorporate the further qualification "without branching." Textron relies on Toro's statement, made in distinguishing the claimed invention over a prior-art reference that was the basis for the PTO's initial rejection of Toro's patent application, that the prior-art reference does not have "the claimed serial/parallel connection in which all of the flow from the source is directed without branching through at least one serially connected drive motor. . . ." JA 0086. This reference to "branching"—made in the context of distinguishing a prior-art reference featuring an all-parallel-drive system—does not require the narrow claim construction advocated by Textron.

It is apparent from the '325 and '664 patents and their prosecution history that the "connected in series" limitation describes the relationship between the motors on two different ends of a vehicle and the fluid source that supplies the motors. As long as the motors and the fluid source are connected serially—i.e., "in a sequential arrangement"—with respect to each other, it is immaterial whether objects other than motors might be found on "branches" of the drive circuit.

A rear motor, for instance, is "connected in series" relative to the front motors and to the fluid source if the fluid flows in sequence (though not necessarily without detours) from the source, to the rear motor, and then to the front motors. Even if the fluid flow passes through a "branch" between the source and the rear motor (say, to pass through a valve or gauge of

---

**2.** Because the written descriptions of the '325 patent and the '664 patent are identical, the Court will refer only to the '325 patent's written description.

some kind), or between the rear motor and the front motors, the motors remain "connected in series" within the meaning of the claim language as long as the fluid does not flow in parallel to the rear and front motors.

### D. Term 7: "to provide maximum tractive effort ..."

■ The Court construes the term "to provide a maximum tractive effort on the rear wheel for a given pressurized fluid flow regardless of wheel slippage conditions on the front wheels" in claim 1 of the '325 patent—as well as the similar language in claims 9, 15, and 24 of the '325 patent and claims 1 and 9 of the '664 patent—as follows:[3]

> A wheel—call it Wheel A—receives the "maximum tractive effort for a given pressurized fluid flow regardless of wheel slippage conditions" on other wheels if the pressurized fluid flow to Wheel A's motor is not affected by whether those other wheels slip.

This is essentially the construction proposed by Toro, Toro Opening Br. at 30, and it is consistent with the intrinsic evidence.

Textron would construe this limitation to require that "maximum tractive effort is *always* provided" to a particular wheel. Textron Opening Br. at 27 (emphasis added).[4] This construction would unduly limit the claim language and is unsupported by the intrinsic evidence. It is plain that

maximum tractive effort need not "always" be provided to the rear (or other in-series) wheel. The motor might, for instance, be disengaged from the wheel (and thus providing less than the maximum tractive effort) while the vehicle is idling.

The key feature of the claimed invention captured by this limitation is not that maximum tractive effort—which both Toro and Textron (and thus the Court) treat as being equivalent to the amount and force of the pressurized fluid flow—is "always" applied to an in-series wheel. Rather, the key feature is that the tractive effort on the in-series wheel does not vary when one of the *parallel-connected* wheels slips. This contrasts with an all-parallel-drive system, in which slippage of one wheel affects the fluid flow to other wheels connected in parallel to the slipping wheel. The construction advocated by Toro and essentially adopted by the Court is consistent with the key innovative feature reflected in the patent claims.

### E. Term 8: "means ... to allow such wheel to overrun the hydraulic motor ..."

■ The Court construes the term "means operatively connected to the wheel drive motor for the rear wheel to allow such wheel to overrun the hydraulic motor driving such wheel when required during turns of the mower" in claim 5 of the '325 patent, and the similar language in claim 21 of the '325 patent and in claims 2, 12,

---

**3.** Claim 9 of the '325 patent refers to tractive effort on "each rear wheel" rather than "the rear wheel" (as in Claim 1), because claim 9 describes a device that may have multiple rear wheels. Claims 15 and 24 of the '325 patent and claims 1 and 9 of the '664 patent refer not to "front" and "rear" wheels, but rather to wheels on a "first end" and a "second end." These differences are inessential for claim-construction purposes.

**4.** Toro makes much of the fact that Textron's proposed construction refers to a "rear

wheel" even though some patent claims including the disputed language refer to wheels at a "second end" of the vehicle. Toro Opening Br. at 31. But Toro's proposed construction suffers the same flaw, as it refers to "the rear drive wheel." *Id.* at 30. The Court recognizes that both Toro and Textron used the adjective "rear" as shorthand, and nothing in this order turns on the parties' uses of the word "rear" in their proposed claim constructions.

and 15 of the '664 patent, to be a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.[5] The claimed function and the structure that corresponds to this function are as follows:

> The claimed function is to allow the rear wheel (or the wheel or wheels on a "second end" of the device), during a turn, to spin faster than the shaft of the motor driving the wheel (or wheels). The structure that performs this function must be a mechanical overrunning clutch.

The parties agree that this is a means-plus-function limitation. They differ over how to construe the claimed function and the corresponding structure.

Toro's proposed function—"to allow the rear wheel to overrun its motor in a turn"—simply restates the claim language. Toro Opening Br. at 34. This leaves unanswered the key question: What does it mean for a wheel to "overrun" a motor? According to Textron, a wheel overruns its motor if the wheel and the motor "turn at different speeds." Textron Opening Br. at 36. Textron's definition of "overrun" is obviously too broad: If the wheel turns slower than its motor, the wheel "underruns" the motor, it does not "overrun" it.

At the *Markman* hearing, Toro argued that a wheel "overruns" its motor if the wheel turns faster than it would based solely on the impetus provided by the motor, even if the motor and wheel are turning at the same speed. Such "overrunning" would occur (to use an example given by Toro) if a bicycle's rear wheel and its front sprocket (i.e., the sprocket attached to the pedals) were rigidly linked, and the bicycle were going downhill and receiving all of its motive force

from gravity rather than from pedaling by its rider. In such a situation, the bicycle's front sprocket and rear wheel would be turning at the same speed (setting gear-ratio issues aside), but since the driving force on the front sprocket (equivalent to a motor's shaft) would be zero, the rear wheel would necessarily be turning faster than it would turn based only on the driving force imparted by the front sprocket—that is, the rear wheel would be "overrunning" the front sprocket as Toro construes the word "overrun."

Toro's argument is creative, but it is not supported by the intrinsic evidence. The '325 patent explains that unless some kind of clutch is provided to a serially driven rear wheel in the claimed vehicle, the rear wheel "would not be able *to speed up* as needed" during turns. '325 Patent Col. 6:8–9 (emphasis added). The patent then describes the need for a "means for allowing rear wheel 10 to overrun during turns *to increase its speed." Id.* Col. 6:13–14 (emphasis added). In further describing the clutch that would allow this "overrunning," the patent says that the clutch will release the motor shaft "if rear wheel 10 starts to *turn faster than motor shaft 31* to allow rear wheel 10 to speed up and overrun the shaft...." *Id.* Col. 6:36–39 (emphasis added). It is apparent from the '325 patent itself that a wheel "overruns" its motor if it turns faster than the shaft of the motor driving the wheel, and the Court's construction captures this idea.

As to the structure that corresponds to this function, Toro argues that it is simply an "overrunning clutch." Toro Opening Br. at 34. Textron argues that it is a "roller clutch bearing mounted between the motor drive shaft and the wheel hub."[6]

---

**5.** Claim 21 of the '325 patent and claims 2, 12, and 15 of the '664 patent refer to "wheel(s)" rather than a "wheel," and to the "second end" rather than the "rear" of the

device. These differences are immaterial for claim-construction purposes.

**6.** The construction proposed by Textron in its *Markman* briefs differs from the one advanced

Textron Opening Br. at 36. The Court agrees with neither Toro nor Textron.

▮ After identifying the claimed function in a means-plus-function limitation, a court must next "identify the corresponding structure set forth in the written description that performs the particular function set forth in the claim." *Asyst Techs., Inc. v. Empak, Inc.,* 268 F.3d 1364, 1369 (Fed.Cir.2001). The "corresponding structure" must be clearly linked or associated, in the specification or prosecution history, with the claimed function. *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424 (Fed.Cir.1997).

Toro and Textron do not dispute these general principles, nor do they dispute that an "overrunning clutch" of some kind is specifically linked to the claimed function of allowing the rear wheel to overrun its motor in a turn. They disagree, however, over the *level of generality* at which the structure "overrunning clutch" must be defined for claim-construction purposes. Toro's proposed structure is extremely general, while Textron's is highly specific and incorporates details of a preferred embodiment disclosed in the patent.

The parties have not cited, and the Court has not found, any Federal Circuit cases that specifically explain the level of generality at which a "corresponding structure" should be defined when construing a means-plus-function limitation. But based on *Micro Chemical, Inc. v. Great Plains Chemical Co.,* the Court concludes that the appropriate level of generality is in between the levels implicit in Toro's and Textron's proposed constructions. 194 F.3d 1250 (Fed.Cir.1999). In *Micro Chemical,* the Federal Circuit held that the structure corresponding to a "weigh means" included two types of scales, one

like a bathroom scale (i.e., in which a load sits on top of the scale), and one like a hanging produce scale (i.e., in which a load hangs from the scale). *Id.* at 1259.

In adopting this construction, *Micro Chemical* rejected the district court's claim construction. The district court had defined the corresponding structure in much more detail, to include weigh towers and a particular type of hopper. *Id.* at 1255 (discussing district court's claim construction). A review of the patent at issue in *Micro Chemical,* U.S. Patent No. 4,733,-971, reveals that the patent's written description describes the "weigh means" as including precisely the elements included in the district court's claim construction. For example, the patent states: "The weigh means includes, at each end of the subframe 34, a weigh tower projecting upwardly from the subframe and suspending therein a load cell 264." U.S. Pat. No. 4,733,971 Col. 6:19–22.

▮ In rejecting the district court's claim construction, *Micro Chemical* emphasized that § 112, ¶ 6 forbids a claim construction that "incorporat[es] structure from the written description beyond that necessary to perform the claimed function." 194 F.3d at 1258. This Court takes *Micro Chemical* to mean that the "corresponding structure" for a means-plus-function limitation should not be defined to include every structural detail recited in the written description. This is consistent with *Asyst Technologies,* which observed that "[s]tructural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." 268 F.3d at 1370; *see also id.* (construing the structure corresponding to the function of "receiving and processing digital infor-

---

by Textron in the JCCS. The Court focuses on the construction advanced in Textron's *Mark-*

*man* briefs.

mation" to be simply a "local control processor").

The written description of the '325 patent specifies that a "preferred means" for performing the function of allowing the rear wheel to overrun its motor during turns is "mechanical overrunning clutch means 50." '325 patent Col. 6:14–16. The patent goes on to say that "[c]lutch means 50 is a unidirectional clutch ... [that] comprises at least one roller clutch bearing 56 with a splined inner diameter 58 which normally grips the motor shaft." *Id.* Col. 6:20–27. The patent also provides a part number for a particular commercial roller clutch bearing that could be used in the invention. *Id.* Col. 6:34–35. Textron does not suggest that the "corresponding structure" in this means-plus-function limitation includes only the specific commercially available part identified by number in the patent, but Textron does ask the Court to construe the structure at a fairly detailed level, to include the particular type of mechanical overrunning clutch described in the patent.

Textron's proposed construction is too detailed in light of Federal Circuit law on interpreting means-plus-function limitations. Toro's proposed construction, however, is too general: "overrunning" is simply a function, and "clutch" is a generic type of device, not a sufficiently specific structure. Accordingly, the Court finds that a "mechanical overrunning clutch" is the structure identified in the patent's written description as corresponding to the claimed function of allowing the rear wheel to overrun its motor during turns.

### F. Term 9: "overrunning clutch means"

The Court construes the term "overrunning clutch means" in claim 24 of the '325 patent and claim 9 of the '664 patent to be a means-plus-function limitation under 35 U.S.C. § 112 ¶ 6. The claimed function and corresponding structure are those identified above in connection with disputed Term 8.

The use of the word "means" in the term "overrunning clutch means" raises a presumption that this is a means-plus-function limitation. *Micro Chem.*, 194 F.3d at 1257. The presumption can be overcome "if the claim itself recites sufficient structure, material, or acts to perform the claimed function." *Id.*

Toro argues that the presumption is overcome because "overrunning clutch" is a sufficiently definite structure. Toro Opening Br. at 37. The Court disagrees. As noted above, the adjective "overrunning" describes only function, not structure. And the noun "clutch" denotes a large class of devices for creating an interruptible connection between a driving element and something being driven. *See generally BorgWarner, Inc. v. New Venture Gear, Inc.*, 237 F.Supp.2d 919 (N.D.Ill.2002) (discussing various types of clutches in construing patent claims related to an all-wheel-drive system). Thus the term "overrunning clutch" does not describe sufficient structure to take the term "overrunning clutch means" outside of § 112, ¶ 6.

### G. Term 11: "turf maintenance operation"

The Court construes the term "turf maintenance operation" in claims 15, 17, and 24 of the '325 patent to mean:

> An operation for maintaining grass- or vegetation-covered soil or for maintaining sand. Such operations include mowing, sand grooming, and aeration.

Toro advocates a similar construction, but proposes that the Court construe this to mean an operation for maintaining "the *turf environment* including mowing, sand grooming, or aeration." Toro Opening Br. at 40 (emphasis added). Toro's proposed

construction is unhelpful, however, because it defines the vague claim term "turf" by means of the equally vague term "turf environment." The key issue is what "turf" means, and Toro's construction does not answer that question, except by implication. The Court has therefore substituted "grass- or vegetation-covered soil" and "sand" for Toro's proposed "turf environment."

Textron argues, in effect, that this term does not need to be construed: It proposes construing "turf maintenance operation" to mean "an operation for maintaining turf," Textron Opening Br. at 49, which does nothing to elucidate the term's meaning. Such a construction would force the reader (or the jury) to supply the meaning of "turf," which Textron argues should have its ordinary meaning—a meaning that excludes sand. *Id.*

The Court agrees with Textron that "turf" would not ordinarily include sand. But the intrinsic evidence demonstrates that Toro intended that "turf maintenance operation" include operations performed on sand, such as sand grooming. Both the '325 patent itself and the patent's prosecution history indicate that Toro intended its claims to cover sand-grooming machines, as well as mowers and aerators. *See* '325 patent col. 6:51–52 ("The invention could also be applied to a three wheel vehicle, such as the Sand Pro or Infield Pro . . . ."); JA 104 ("Independent claim 26 . . . would in addition to covering riding mowers also cover other similar vehicles, such as sand trap grooming vehicles, aerating vehicles, or the like.") Toro therefore put the world on notice that "turf maintenance operation" means operations performed not only on grass- or vegetation-covered soil (i.e., on "turf"), but also on sandy areas such as sand traps and baseball diamonds.

### H. Term 14: *"individual hydraulic drive motors . . ."*

■ The Court construes the term "individual hydraulic drive motors operatively engaged to each of the ground engaging wheels" in claims 1, 9, 15, and 24 of the '325 patent, and claims 1, 9, 11, and 14 of the '664 patent, to mean:

A single hydraulic drive motor operatively engaged to each of the ground engaging wheels.

This is essentially the construction proposed by Toro (though Toro advocates "one and only one" rather than the word "single"). Toro Opening Br. at 42. This construction reflects the most natural reading of the word "individual" given that it is paired with the adjective "each" in the relevant claim language.

Textron, however, contends that the word "individual" in this disputed term means "one or more." Textron Opening Br. at 50. Textron points out that claim 24 of the '325 patent claims a device that includes not only "individual hydraulic drive motors operatively engaged to each of the ground engaging wheels on the first end of the frame"—the disputed term—but also "*at least one* individual hydraulic drive motor operatively engaged to the ground engaging wheel(s) on the second end of the frame." Textron Opening Br. at 51–54. According to Textron, the phrase "at least one" makes no sense if "individual" is construed to mean "one and only one"—or, necessarily, the synonymous word "single." *Id.* at 52.

The Court disagrees with Textron that, in light of claim 24, an "individual" motor cannot be a "single" motor. One could substitute the phrase "at least a single motor" for the phrase "at least one individual motor" without doing any violence to the latter phrase's meaning. Further, claim 24's reference to "at least one individual" motor differs significantly from the

disputed term "individual hydraulic drive motors" because claim 24 pairs the phrase "at least one individual hydraulic drive motor" with "*the* ground engaging *wheel(s)*." '325 patent claim 24 (emphasis added). The disputed claim language, however, pairs the phrase "individual hydraulic drive motors" with "*each* of the ground engaging wheels." The word "individual" in the disputed term, in light of the corresponding adjective "each" modifying "wheels," is best understood as denoting a single motor engaged to each wheel.

## IV. CONCLUSION

In light of the specifications (including the claims) of the '325 and '664 patents, those patents' prosecution histories and their purposes as disclosed in all of the intrinsic evidence, the ordinary meaning of the claim language, and the parties' arguments, the Court construes the disputed claim language as stated above.