### In re MANCHAK PATENT LITIGATION

No. MDL 1228.
Civ. A. No. 98–356(MPT).

United States District Court,
D. Delaware.

Dec. 20, 2002.

Edward M. McNally, Morris James Hitchens & Williams, LLP, Wilmington, DE, for Frank Manchak, Jr.

Brian W. Erikson, and Eric A. Zukoski, Quilling, Selander, Cummiskey & Lownds, P.C., Dallas, TX, for defendant, Agronomic Management Group, Inc.

## MEMORANDUM

THYNGE, United States Magistrate Judge.

## I. Introduction

This case is part of the multi-district litigation involving Frank Manchak Jr.'s patent infringement claims against several parties. Manchak filed the present suit in January 1998, against Agronomics Management Group, Inc. ("AMG"), alleging infringement of United States Patent No. 4,079,003 (" '003").[1] Presently, the defendant has two summary judgment motions before the court. The first is AMG's motion for the nonexistence of sludge, and second is its motion for summary judgment based upon prior settlement.

## II. Background [2]

The '003 patent, entitled "Method of Transforming Sludge Into Ecologically Acceptable Material," originally issued on March 14, 1978. Put simply, the patent is directed to a process by which wastewater is treated so it can be re-used for other purposes. Manchak states that the patent is designed for "mixing sludge and calcium oxide-containing materials to make a stabilized reaction product." *D.I. 57 at 4.* According to AMG, the treatment process at Village Creek

> involved pumping liquid 'sludge' ... and passing that material through a belt-filter dewatering device to press the material into cake. The cake was thereafter dropped into a feed hopper and, in turn, into a screw auger. Within the screw-auger device, the cake was mixed with quicklime and moved to the other end of the approximately 9 foot device through the turning of the auger. At the far end, the mixture of cake and quicklime dropped onto a radial stacker conveyor system, which transported the mixture to a concrete pad where the quicklime and water in the cake solids reacted to raise pH of the material and to drive off water through the heat of hydrolysis.

*D.I.50 at 5.*

In October 1997, after the patent had expired, a third party, William Pierro, instituted a patent reexamination proceeding in the Patent and Trademark Office ("PTO") which brought possible prior art

---

1. Manchak originally filed the case in the Northern District of Texas. In June 1998, the case was transferred to this District as part of the multi-district litigation.

2. All facts are taken from the parties' briefs.

to the attention of the PTO.[3] That prior art was U.S. Patent No. 918,744 ("Fryklind") in view of a 1974 article written by James Smith and Robert Dean. The PTO initially rejected the '003 patent as obvious under Fryklind in view of Dean and Smith.[4] Manchak appealed the rejection, and in April 1999, the PTO issued a Notice of Intent to Issue Reexamination Certificate. In that notice, the PTO confirmed the patentability of all the '003 patent claims without amendment and stated:

> For the reasons stated in the declarations submitted by Frank Manchak and Ronald Neufeld on June 10, 1998; and the supplemental declaration of Frank Manchak filed on October 29, 1998, the definition of night soil is not compatible with the definition of a sludge having a water content of not over 75% by weight, as defined by applicant's specification in column 9, lines 13–24.[5]

*D.I. 50 at 18* (citing the PTO's Notice of Intent to Issue Reexamination Certificate).

In May 1997, Judge McKelvie issued an opinion in *Manchak v. Chemical Waste Management, Inc.*, 1999 WL 1103364, 1999 U.S.App. LEXIS 32001 (Fed.Cir.1999) (the *"Sevenson"* case), which construed various terms in the '003 patent, including "sludge."[6] He found that sludge, as used in the '003 patent "is a concentrate of settled colloidal suspension with a mushy or mud texture, a gel (with up to more than 90 percent usually water) but quite viscous. It may contain indiscriminate solids as grits, fiber, wood chip and emulsions."[7] *Sevenson* proceeded through trial and post-trial briefing before being appealed to the Federal Circuit. This case was stayed in July of 1998 in order to finish the reexamination and to allow the Federal Circuit to render a decision on the appeal. The Federal Circuit overturned Judge McKelvie's construction of another term in the '003 patent, "confined space," but did not address his construction of "sludge." *See Sevenson*, 1999 WL 1103364, *1. The stay was lifted in May 2000.

---

3. Manchak implicitly alleges that AMG instituted the reexamination proceeding by inventing Pierro. Such allegations are irrelevant and the court gives them no weight. *See D.I. 57 at 6.*

4. In its brief, AMG states "The PTO found that, although, Fryklind was silent as to the pH of the mixture and did not disclose transformation of toxic water soluble components into insoluble ones, those elements were disclosed in the Dean and Smith paper, rendering the claims in the '003 patent obvious to one of ordinary skill in the art." *D.I. 50 at 13.*

5. Manchak argues that this statement is not part of the prosecution history, and thus is extrinsic evidence which the court should not consider when construing the meaning of sludge. Manchak forgets that in his original construction of sludge, Judge McKelvie looked to extrinsic evidence finding that the specification and prosecution history failed to define sludge. However, the court did not

rely upon this statement when reaching its construction of sludge. Instead, the court finds that the totality of the evidence, excluding the above statement, overwhelmingly shows that Manchak surrendered his previous broad definition of sludge. Thus, for the purpose of this motion, whether the "Notice of Intent to Issue Reexamination Certificate," became part of the patent's prosecution history is irrelevant.

6. *Sevenson* was also part of the multi-district litigation.

7. *D.I. 58 at B00026.* Finding that neither the specification nor prosecution history defined sludge, Judge McKelvie considered extrinsic evidence in the form of expert testimony to determine its appropriate meaning. Manchak's expert advocated the application of the PTO's Class 210 definition of sludge. During cross-examination, Sevenson's expert admitted that the PTO's definition was suitable. Thus, Judge McKelvie adopted it as the construction of "sludge."

## IV. Legal Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If the parties dispute a material fact, it is inappropriate for the court to grant a motion for summary judgment.[8] However, the parties' disagreement must be genuine.[9] A genuine issue of fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248 (citations omitted).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). That party can meet this burden by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Further, a party opposing a supported motion must present evidence showing that there is a genuine issue of material fact, rather than relying on the pleadings.[10] The court should grant summary judgment if either party "fails to make a showing sufficient to establish the existence of an [essential element] . . . on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of [that] . . . party's case necessarily renders all other facts immaterial." *Id.*

When reviewing a motion for summary judgment, a court must evaluate the facts in a light most favorable to the nonmoving party drawing all reasonable inferences in that party's favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The court should grant the motion "unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." *Id.* at 251, 106 S.Ct. 2505. In deciding a motion, the court should apply the evidentiary standard of the underlying cause of action. *See id.* at 251–52, 106 S.Ct. 2505.

> In every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.

*Id.* at 251, *106 S.Ct. 2505.*

## III. Noninfringement Motion

### A. Parties' Contentions

As a threshold matter, AMG argues that its partner in a joint venture, Oscar Renda Contracting, Inc., processed the wastewa-

---

8. *See Anderson et. al. v. Liberty Lobby, Inc., et. al.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202; "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

9. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

10. Rule 56(e) provides that the opposing party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

ter at the Village Creek site. According to AMG, it should not be liable for infringement because it had nothing to with the plant processing.[11] Alternatively, AMG asserts that the Village Creek processing does not infringe '003 patent. The court will address this latter argument first, since the parties focused on this issue at oral argument.

Specifically AMG claims that in the patent reexamination process, Manchak limited his patent to the preferred embodiment, requiring a consistency of 75% water and 25% solid, in order to distinguish it from Fryklind. To support its contentions, AMG points to numerous statements Manchak made to the PTO, and the PTO's statements in its "Notification of Intent to Issue a Reexamination Certificate."[12]

In response, Manchak alleges that AMG infringed its patent by processing sludge at the Village Creek Plant "using a long, narrow mixer to stabilize dewatered sewage sludge with calcium oxide." *D.I. 57 at 5.* He asserts that AMG's proposed construction contradicts Judge McKelvie's construction in *Sevenson,* and characterizes it as an "assault on Judge McKelvie's construction."

Manchak denies AMG's allegations that he limited the '003 patent in the reexamination proceeding. Instead, he maintains that in that proceeding he merely confirmed the patent specification which provides that the 75, 25% ratio is *preferable.*[13] According to Manchak, he had no reason to limit sludge to a consistency of 75% water and 25% solid because Fryklind

deals with night soil which is much more watery than sludge. Consequently, night soil cannot be treated by the '003 process because it will run through the mixer, and will not remain in the mixer while the calcium oxide is added. Further, Manchak notes that Fryklind did not specify the appropriate water to solid ratio. Thus, according to Manchak, his comments to the PTO "simply explained the inherent difference between 'night-soil'—which is watery and liquid—and the 'sludge' described in the '003 Patent—which is viscous and pasty." *D.I. 57 at 3.* Manchak asserts that the use of numbers to demonstrate the consistency of the sludge was necessary because the patent examiner did not understand the purpose and the importance of the consistency levels in night soil and sludge. Accordingly, the precise numerical ratio is not important to the '003 patent. Rather, the patent merely requires that the consistency of the sludge must be thick enough for it to be retained in the mixer. Manchak supports his arguments through his expert, Dr. Neufeld, who opines that the '003 patent is not limited to 75% liquid consistency.[14]

At oral argument, Manchak argued that in order to grant summary judgment in AMG's favor, the court must find that Manchak unequivocally disavowed Judge McKelvie's prior construction of sludge, citing *Cybor Corporation v. FAS Technologies, Inc. and FAStar Ltd.,* 138 F.3d 1448 (Fed.Cir.1998).

Additionally both parties argued the applicability of *Elkay Manufacturing Com-*

---

11. These arguments are discussed in Manchak's second summary judgment motion.

12. For a brief summary of these statements see AMG reply brief page 8.

13. " 'The sludge 116 to be transformed to a reaction product 164 preferably has a water content of not over 75 percent (75%) by weight. If the sludge has over 75 percent

(75%) by weight of water it is preferably pretreated in a hopper ... with thickening agents added thereto and thoroughly mixed therewith, prior to feeding into hopper 112.' " *D.I. 57 at 2* (quoting the '003 patent).

14. Dr. Neufeld was also Manchak's expert in the patent reexamination procedure.

*pany v. EBCO Manufacturing Company*, 192 F.3d 973 (Fed.Cir.1999), each purporting that the case supported their arguments. *Elkay* involved a similar situation in which the patentee, Eklay, limited the scope of his patent through statements to the PTO. The case dealt with no spill adapters for bottled water coolers, and the central issue was whether the relevant patent called for one or two tubes. The defendants argued that the scope of the patent was narrow, covering only what was presented in the preferred embodiment. The Federal Circuit found that although the written description of the patent did not limit its scope to the preferred embodiment, the patentee so limited the patent in response to a PTO office action challenging its validity.[15]

## IV. Discussion of Noninfringement Motion

### A. Review of the prior construction of Sludge

■ In patent infringement cases, before the trier of fact can evaluate whether the patent is infringed, the court must construe the meaning of any disputed patent terms. *See Markman v. Westview Instruments, Inc.* 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)[16]. The

fact finder must then use the court's construction to evaluate infringement. *Id.*

■ Here, when taking Manchak' statements in the context of the reexamination proceeding, it is clear that he limited the '003 in order to overcome the PTO's rejection of the claims upon reexamination. Manchak repeatedly told the PTO that the sludge called for in his patent differed from the night-soil of Fryklind because it contained a 75% water consistently, or a 25% solid consistency. In response to the PTO's reexamination proceeding, Manchak stated:

> In analyzing the differences, the first difference arises concerning the word sludge as it must be construed in the '003 patent claims. Mr. Manchak's specification describes the sludge that his invention operates upon a mixture in "... a pasty or soupy condition of very stiff soup." Additionally, "[t]he sludge 116 containing at least 25 percent (25%) solid particles may have an industrial or municipal origin, and includes such diverse materials as hydrocarbon mixtures from oil well sumps, sewage, hazardous marine silt and the like." These statements in the specification establish the meaning of the term sludge as used in the Manchak claims. Although English language dictionaries may provide broader definitions of sludge, it is the

---

15. When asked what would qualify as an "unequivocal disavowal" of the prior construction of sludge, counsel for Manchak pointed to the *Elkay* decision as an example. Further, he asserted that Manchak's alleged disavowal was much more ambiguous than the patentee in *Elkay*. Conversely, AMG urged the court to apply *Elkay*, arguing that the case was indistinguishable from the present facts. The court finds that Manchak's statements to the PTO and the chronology of events surrounding those statements, are similar to the facts of *Elkay*, as set forth in that opinion. The court finds Manchak's argument that his actions did not rise to the level of Eklay's actions unpersuasive, as it is difficult to imagine

additional ways in which Manchak could have limited the scope of his patent.

16. "The two elements of a simple patent case, construing the patent and determining whether infringement occurred, were characterized by the former patent practitioner, Justice Curtis. 'The first is a question of law, to be determined by the court, construing the letters-patent, and the description of the invention and specification of claim annexed to them. The second question is a question of fact, to be submitted to a jury.'" *Markman*, 517 U.S. at 384, 116 S.Ct. 1384 (citations omitted).

inventor's definition that controls how it is to be construed in the patent claims, provided the inventor's definition is not ambiguous or incomplete.... Thus the "semi-liquid" night soil disclosed in Fryklind, comprising human feces, urine and water, is different from the "pasty" or "very stiff soup" having at least 25% solid particles constituting sludge as recited in Manchak's claim 1.

*D.I 51 at A40, A41.*

This was one of many statements Manchak made to the PTO regarding the consistency of the sludge. Manchak's explanation that he was forced to use 75% and 25% as examples because the patent examiner did not understand the difference between the night-soil and sludge is unpersuasive. If the relevant difference between the two is that night-soil is too watery to withstand the mixing process, thus making the '003 patent useless when night soil is used, it seems highly unlikely that Manchak was unable to provide such an explanation to the patent examiner, or that the patent examiner could not understand. Although Manchak correctly cites *Cybor Corporation* for the proposition that every statement made by a patentee does not create estoppel, this case contains numerous limiting statements which together estop Manchak from now asserting that the 75% water limitation in the '003 is merely a preference.

Thus the proper construction of "sludge" under the '003 patent is: "a substance with at least 25% solid particles constituting sludge, as recited in Manchak's claim 1."

## B. Infringement

In its motion, AMG, seeks summary judgment on the issue of noninfringement, but does not specify whether it is requesting judgment on literal infringement or under the doctrine of equivalence ("DOE"). Thus the court will evaluate both literal infringement and infringement under DOE.

### 1. Literal Infringement

■ Under patent law, a patent is infringed only if the accused process embodies each claim of the patent. *See Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211 (Fed.Cir.1998). Since the court has held that Manchak limited his patent to 75% water consistency, and there is no dispute that AMG's sludge is 22% solid rather than 25%, no reasonable trier of fact could find that AMG infringes the '003 patent.

### 2. Doctrine of Equivalence

■ Despite the absence of literal infringement, a patentee may still recover for infringement pursuant to the DOE. *See Cybor Corporation,* 138 F.3d at 1459. Under that doctrine, patent infringement occurs "if each limitation of the claim is met in the accused device either literally or equivalently." *Id.* If the DOE applies, the accused infringer may use prosecution history estoppel to prevent a patentee from recapturing claim elements surrendered during the prosecution.[17]

■ Again, because the court has already found that Manchak limited sludge to 25% solid content, and revised the construction of sludge, it must also grant sum-

---

**17.** *Id.* at 1460. "Prosecution history estoppel provides a legal limitation on the application of the doctrine of equivalents by excluding from the range of equivalents subject matter surrendered during prosecution of the application for the patent. The estoppel may arise from matter surrendered as a result of amendments to overcome patentability rejections, or as a result of argument to secure allowance of a claim." *Id.* (citations omitted).

mary judgment in favor of AMG. Manchak's statements, which formed the basis of the court's readjustment of the construction of "sludge," are similarly persuasive in evaluating prosecution history estoppel. It is clear from the evidence that Manchak intentionally narrowed the scope of the term "sludge" in order to avoid an obviousness rejection by the PTO. Under the new construction, no reasonable fact finder could define the term sludge in AMG's process to be equivalent to the sludge called for in the '003 patent.

## V. Prior Settlement

■ The court's decision on infringement moots AMG's second motion. However, for the sake of completeness the court will evaluate AMG's second motion.

In its prior settlement motion, AMG claims that the Village Creek Plant is owned by the city of Fort Worth. According to AMG, Renda, its joint venturer had a contract with Fort Worth to perform operations at the plant before 1992 (the year in which AMG was incorporated), and continues to be under contract with the city today. Thus, AMG claims that it never operated or processed anything at the plant, and has never had a contract with Fort Worth to do so. Further, AMG notes that Renda purchased all of the lime for the plant operations, and provided all of the labor.

AMG further argues that Renda is a customer of RDP Company ("RDP"), who was sued by and later reached a settlement with Manchak. The settlement agreement contained a provision protecting all of RDP's customers from potential lawsuits by Manchak. As a result, AMG claims that RDP and its customers have a license under the patent. AMG further claims that since Renda has a license under the patent, it cannot be sued by Manchak for consulting with Renda. To support its position, AMG cites the affidavits of Mark Clark, AMG's Vice-president, and Oscar Renda, RDP's President, and the deposition of Mark Clark.

Manchak claims that AMG is not a customer of RDP.[18] He cites to the affidavits of Ed Tacha and Mark Clark,[19] both of whom stated under oath that AMG had a contract with the city.[20] Additionally, plaintiff claims that AMG has admitted that it processed sludge at the plant in court documents. Further, Manchak asserts that RDP denies that AMG was ever its customer, and that fact alone should be sufficient for the court to order summary judgment on its behalf.

Manchak also argues that under Pennsylvania law, neither AMG or Renda is considered a customer of RPD. The RDP/Manchak settlement occurred in Pennsylvania, and that court still retains jurisdiction over the settlement agreement. Judge Giles in the Eastern District of Pennsylvania found that an entity can only be a "customer" for the "period of time in which it actually used RDP equipment to process sludge."[21] Finally, Manc-

18. Plaintiff also raises the procedural argument that AMG failed to raise its argument as an affirmative defense, and are raising it for the first time in this summary judgment motion.

19. According to Manchak, Ed Tacha is a Vice President at AMG, and Mark Clark is an AMG Project Agronomist. AMG states that Mark Clark is a Vice–President at the company.

20. Manchak notes that those affidavits were submitted by AMG with their first motion for summary judgment.

21. *D.I. 55 at 3*. Manchak argues that AMG was not a third party beneficiary to the RDP/Manchak contract under Pennsylvania law. AMG does not address this argument, so the court will not rule on the issue at this time.

hak notes that AMG never used any RDP equipment during the relevant time periods, and thus cannot be a customer under Judge Giles' construction of "customer" under the Manchak/RDP settlement agreement.

In light of the evidence presented, it is evident that there is a genuine issue of material fact. Thus, AMG's motion for summary judgment on the issue of prior settlement is denied. However, this finding does not impact the court's judgment in favor of AMG on infringement.

## VI. Conclusion

For the reasons stated herein, AMG's summary judgment motion for the nonexistence of · sludge is GRANTED, and AMG's summary judgment motion for prior settlement is MOOT.